UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 5171 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| CHARLES E. BOX, Chairman, ERIN M. | ) | |
| O'CONNELL-DIAZ, LULA M. FORD, | ) | |
| ROBERT F. LIEBERMAN in Their Official | ) | |
| Capacities as Commissioners of the Illinois | ) | |
| Commerce Commission and Not as Individuals, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CIMCO COMMUNICATIONS, INC.; COVAD | ) | |
| COMMUNICATIONS CO.; CBEYOND | ) | |
| COMMUNICATIONS, LLC; GLOBALCOM, | ) | |
| INC.; NUVOX COMMUNICATIONS OF | ) | |
| ILLINOIS, INC.; MCLEODUSA | ) | |
| TELECOMMUNICATIONS SERVICES, INC.; | ) | |
| XO COMMUNICATIONS SERVICES, INC.; | ) | |
| and ACCESS ONE, INC.; | ) | |
| | ) | |
| Defendants/Intervenors. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Illinois Bell Telephone Company, d/b/a AT&T Illinois ("AT&T Illinois"), is the

incumbent local exchange carrier ("ILEC") for northern Illinois. *Ill. Bell Tel. Co. v. Box*, 526

F.3d 1069, 1070 (7th Cir. 2008). AT&T Illinois filed this action pursuant to the

Telecommunications Act of 1996 (the "1996 Act"), seeking declaratory and injunctive relief

against Charles E. Box, Erin M. O'Connell-Diaz, Lula M. Ford, and Robert F. Lieberman

("Commissioners"), in their official capacities as commissioners of the Illinois Commerce

Commission ("ICC"), to challenge certain determinations made by the ICC in its December 6, 2006 Order, Docket No. 06-0029 ("ICC Order"). (R. 33, AT&T Opening Br., Ex. 1, ICC Order.) AT&T Illinois contends that the ICC's determinations violate federal law. This Court granted the unopposed motions of several competing local exchange carriers ("CLECs")—Cbeyond Communications LLC, COVAD Communications Company, Globalcom, Inc., XO Communications of Illinois, Inc., CIMCO Communications, Inc., McLeodUSA Telecommunications Services, Inc., Nuvox Communications of Illinois, Inc. (hereinafter, "Defendants/Intervenors")—for leave to intervene.[1] (R. 14, 10/17/07 Min. Order; R. 27, 10/30/07 Min. Order; R. 29, 10/31/07 Min. Order.)

## TELECOMMUNICATIONS ACT OF 1996

The 1996 Act sought to increase competition in local telephone markets by requiring ILECs—local phone companies that were spun off from the old AT&T—to supply certain services to new phone companies to enable them to compete in the business. 47 U.S.C. § 251. Congress recognized that CLECs would not otherwise be able to rapidly and efficiently replicate the facilities developed over time by the ILECs. *Indiana Bell Tel. Co. v. McCarty*, 362 F.3d 378, 382 (7th Cir. 2004). Accordingly, the 1996 Act required ILECs to allow CLECs to interconnect with their networks by providing CLECs with "unbundled" access to certain elements of their networks, at a certain price and under certain conditions, specified by the Federal Communications Commission ("FCC"). 47 U.S.C. § 251. "Unbundling" means "giving separate

---

[1] In their brief in response to AT&T Illinois' motion for declaratory and injunctive relief, Defendants/Intervenors added "Access One, Inc." as a party without explanation. (R. 40, Defs.'/Intervenors' Resp. Br.) As the addition of Access One, Inc. as a Defendants/Intervenor does not alter the Court's analysis, and no party has objected to this addition, the Court will consider Access One, Inc., as one of the Defendants/Intervenors.

prices for equipment and supporting services." *McCarty*, 362 F.3d at 389. In determining what network elements should be made available on an unbundled basis,[2] the 1996 Act directs the FCC to consider, at a minimum, whether: (A) "access to such network elements as are proprietary in nature is necessary;" and (B) "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2).

## TRIENNIAL REPORT AND REMAND ORDER

The latest rules set out by the FCC to implement the 1996 Act are set out in the FCC's February 2005 *Triennial Review and Remand Order*, 20 F.C.C. Rcd. 2533 (2005) ("*TRRO*"), *aff'd*, *Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006). In the *TRRO*, the FCC sought to aid implementation of Section 251(d)(2)(B) by identifying the geographic areas, referred to as "wire centers," where CLECs would be impaired in their ability to compete against the ILEC without unbundled access to high capacity loop and/or transport facilities from the ILEC. The *TRRO* stated, in relevant part, that a wire center is not impaired if the CLECs have sufficient alternatives to relying on the ILEC's facilities or if there were sufficient revenue opportunities available to justify a CLECs' deployment of its own facilities. *TRRO* ¶ 155. A finding of non-impairment means that CLECs can no longer obtain facilities by leasing them from the ILEC as UNEs; rather, the CLECs must obtain them by constructing their own facilities or purchasing elements from the ILEC at a higher cost. *TRRO* ¶ 2. The FCC sought to "impose[] unbundling obligations only in those situations where . . . carriers genuinely are impaired without access to particular network elements and where unbundling does not frustrate sustainable,

---

[2] Unbundled Network Elements are also referred to as "UNEs."

facilities-based competition." *TRRO* ¶ 2.

The *TRRO* set forth new unbundling rules for particular network elements (*i.e.*, equipment or facilities that transmit communications),[3] including DS1 loops, DS3 loops, DS1 dedicated transport, DS3 dedicated transport, and dark fiber dedicated transport. A loop is a wire that connects an end user to the ILECs' switch in a wire center. 47 C.F.R. § 51.319(a). A DS1 loop can carry the equivalent of 24 voice-grade telephone lines, and a DS3 loop can carry the equivalent of 672 voice-grade lines. *Covad Commc'ns*, 450 F.3d at 536 n.3. DS1 and DS3 dedicated transport mirror DS1 and DS3 loops. *Id.* Dedicated transport includes facilities that are dedicated to a particular carrier used for transmission between or among ILEC wire centers. 47 C.F.R. § 51.319(e)(1). Dark fiber is "fiber within an existing fiber optic cable that has not yet been activated through optronics to render it capable of carrying commmunications services." 47 C.F.R. § 51.319(a)(6)(i). In the *TRRO*, the FCC established the following numeric thresholds to determine if a particular wire center should be designated impaired or not impaired. CLECs are deemed not impaired, and an ILEC is not required to unbundle network elements, where a wire center contains:

> (1) DS1 loops with at least 60,000 business lines and 4 fiber-based collocators ("FBCs").
>
> (2) DS3 loops with at least 38,000 business lines and at least 4 fiber based collocators.
>
> (3) DS1 dedicated transport where the wire centers at each end of the route are both Tier 1 wire centers (containing at least 38,000 business lines or 4 or more unaffiliated fiber-based collocators) or Tier 2 wire centers (containing at least 24,000 business lines or 3 or more unaffiliated fiber-based collocators).

---

[3] *See* 47 U.S.C. § 153 (defining "network element").

4

(4) DS3 dedicated transport or dark fiber transport where the wire centers at each end of the route are either Tier 1 wire centers or Tier 2 wire centers.

*TRRO* ¶ 5. Under FCC rules, once a wire center has been determined to be non-impaired, it remains permanently designated as non-impaired, even if in the future it no longer meets the FCC's criteria for non-impairment. 47 C.F.R. § 51.319(a)(4) and (5); 47 C.F.R. § 51.319(e)(3)(i) and (ii).

## THE ICC DECISION

On February 22, 2005, after the *TRRO* was issued, AT&T Illinois designated certain wire centers as impaired or non-impaired. Several CLECs disagreed with AT&T Illinois' designations, and petitioned the ICC to resolve their disputes as to whether certain network elements should be designated as "impaired" or "non-impaired" under Section 251(d)(2) of the 1996 Act. The 1996 Act provides that when phone companies cannot agree on issues relating to access to a particular network element in a particular wire center, state public utility commissions such as the ICC may decide the issues. *Box*, 526 F.3d at 1070 (citing 47 U.S.C. § 252(b)); *TRRO* § 234.

On January 11, 2006, the ICC opened Docket No. 06-0029 in response to the CLECs' petition. After a hearing in which both sides presented extensive evidence, the ICC made several determinations, two of which AT&T Illinois contests here. First, the ICC ruled that AT&T Illinois must use business line counts from the "immediately preceding December" for its "initial and future" non-impairment designations. ICC Order at 4-5. Based on this ruling, the ICC held that AT&T Illinois should have used business line counts based on data as of December 31, 2004, rather than December 31, 2003. *Id.* Second, the ICC determined that AT&T Illinois over-

5

counted fiber-based collocators ("FBCs") for purposes of the impairment test because when "a fiber-based collocator is cross-connected with another collocator . . . the second cross-connected collocator should not be counted as a fiber based collocator for purposes of determining wire center designations." ICC Order at 17. Applying its interpretation of the FCC's rules, the ICC affirmed all of AT&T Illinois' non-impairment designations except for two, which the ICC held were indeed impaired. On September 12, 2007, AT&T Illinois brought this action for declaratory and injunctive relief, seeking review of the ICC's reversal of these two designations. (R. 1, Compl.)

## STANDARD OF REVIEW

Section 252(e)(6) of the 1996 Act provides for judicial review of state commission actions. 47 U.S.C. § 252(e)(6); *Ill. Bell Tel. Co. v. Box*, 526 F.3d 1069, 1073-74 (7th Cir. 2008). Whether the ICC properly interpreted the FCC regulations and the 1996 Act is a question of law to be reviewed *de novo*. *McCarty*, 362 F.3d at 385. Questions of fact, by contrast, are reviewed by the district court under the arbitrary and capricious standard. *Id.* at 385. Under the arbitrary and capricious standard, "[a]ll a court need do is determine whether the ICC's bottom line is supported by the record." *MPower Commc'ns Corp. v. Ill. Bell Tel. Co., Inc.*, 457 F.3d 625, 629 (7th Cir. 2006). The Court will overturn the ICC's determination only if it "is unreasonable or unsupported by substantial evidence." *Id.*

AT&T Illinois argues that "the only question presented is a pure question of law" as to whether the ICC properly interpreted the FCC regulations for designating wire centers as impaired or not impaired. (R. 43, Reply at 1.) The ICC and Defendants/Intervenors, however, argue that this Court should apply the arbitrary and capricious standard in reviewing the ICC's

6

Order because the case involves issues of technical expertise, and because the ICC Order "is largely based on the factual record developed before the ICC." (R. 40, Defs.'/Intervenors' Resp. Br. at 7.) Contrary to each parties' suggestions, this case presents mixed questions of law and fact. Where the parties dispute the ICC's interpretation of federal law, the Court reviews these questions of law *de novo*. However, the Court defers to the ICC's application of the law to the particular facts of the case, as these are questions of fact.

## ANALYSIS

## I. Count I: Number of Business Lines

On February 22, 2005, AT&T Illinois designated wire centers as impaired or not impaired using data on business lines listed in the 2003 Automated Reporting Management Information System 43-08 ("ARMIS") report, which is based on the year ending December 31, 2003. ICC Order at 3. At the time of AT&T Illinois' designations, the 2003 ARMIS report was the latest ARMIS data on file with the FCC. *Id.* The CLECs argued, and the ICC agreed, that the relevant impairment data should have come instead from the number of business lines existing at the time the *TRRO* went into effect on March 11, 2005. ICC Order at 5. Although the 2004 ARMIS report (for the year ending December 31, 2004) was not filed until April 2005, the ICC held that AT&T Illinois should have relied on "data gathered" for the 2004 ARMIS calculations in making its designations, rather than the latest filed ARMIS report. *Id.* The ICC further held that going forward, AT&T Illinois should base its non-impairment designations on ARMIS business line counts as of the preceding December. *Id.* AT&T Illinois argues that these determinations, and the resulting change of two of AT&T Illinois' designations from non-impaired to impaired, violated federal law.

7

A business line is an ILEC-owned "switched access line," used by the ILEC itself or a CLEC that leases the line, to serve a business customer. 47 C.F.R. § 51.5. The number of business lines in a wire center equals the sum of all ILEC switched access lines, plus the sum of all UNE loops connected to that wire center. *Id.* In the *TRRO*, the FCC calculated the number of business lines by adding together the business lines reported in the latest ARMIS—which include only switched access lines—and the number of UNE loops. *TRRO* ¶ 105. The FCC reasoned that this definition of business lines "fairly represents the business opportunities in a wire center, including business opportunities already being captured by competing carriers through the use of UNEs." *Id.* Further, basing the definition on an ARMIS filing, already required annually from ILECs, ensures "the accuracy of the thresholds, and a simplified ability to obtain the necessary information." *Id.* In an ARMIS report, the ILEC reports the total number of business lines it provided to its retail customers in a state as of the preceding December 31; it does not report the business lines on a wire center-by-wire center basis. (R. 40, Defs.'/Intervenors' Resp. Br. at 10.) Accordingly, the business lines report in the ARMIS reports must be "disaggregated" to determine whether a particular wire center is impaired or not impaired. (R. 33, AT&T Opening Br. at 15.)

AT&T Illinois contends that based on these definitions, its designation of wire centers as non-impaired based on the 2003 ARMIS report was both "authorized" and "required" by federal law. (R. 43, Reply at 7-11.) First, AT&T Illinois argues that the FCC "required" ILECs to use that particular ARMIS report for their initial post-*TRRO* designations based on the effective date of the *TRRO*. (*Id.* at 7-8.) "Given the need for prompt action," the FCC made the *TRRO* effective March 11, 2005, even though the filing of the 2004 ARMIS report was not due until

8

April 1, 2005. *TRRO* ¶ 235. Further, AT&T Illinois contends it would not have been able to designate wire centers until May 1, 2005, if it used the later ARMIS report because it takes a month to disaggregate the figures in that report. (R. 43, Reply at 8-9.)[4]

Defendants/Intervenors respond that "nowhere in the *TRRO* did the FCC state that business line counts must be taken directly from (and only from) the ILEC's most recently-filed ARMIS report." (R. 40, Defs.'/Intervenors' Resp. Br. at 9-10.) Indeed, the only other federal court to interpret the *TRRO* as to this issue held that the *TRRO* does not require the ILEC to use data from the most recently filed ARMIS report. *See Michigan Bell Tel. Co. v. Lark*, No. 06-12374, 2007 WL 1343691, at *4 (E.D. Mich. May 8, 2007).

In reviewing the FCC rules *de novo*, this Court finds that the FCC did not "require" ILECs to use data from already-filed ARMIS reports. In the *TRRO*, as explained above, the FCC sought to use business line counts to determine impairment because they are an "objective set of data that incumbent LECs already have created for other regulatory purposes." *TRRO* ¶ 105. The FCC then explained that it based its business line count "in an ARMIS filing required of incumbent LECs, and adding UNE figures, which must also be reported," so that it could "be confident in the accuracy of the thresholds, and a simplified ability to obtain the necessary information." *Id.* These references to the ARMIS report in Paragraph 105 constitute the *only* references to the ARMIS reports in the body of the *TRRO*, and they do not indicate any "requirement" for use of an already-filed ARMIS report in making business line calculations.

---

[4] AT&T Illinois also notes that the FCC used the 2003 ARMIS reports for its business line calculations in the *TRRO*. *TRRO* ¶ 105. This fact is not probative of the matter before the Court, however, as the *TRRO* was adopted on December 15, 2004, before all the data for 2004 could have been accumulated.

9

*See id.* Indeed, it is revealing that in the "Executive Summary" of the *TRRO*, where the FCC summarized the exact framework for determining impairment, the FCC made no mention of the ARMIS filings. *TRRO* ¶ 5. In the *TRRO*, the FCC sought to make the data used to determine impairment as objective as possible; however, nowhere in the *TRRO* did the FCC require—or even opine—that ILECs must only use already-filed ARMIS reports for their business line counts.

Nevertheless, regardless of whether it was required to use the 2003 ARMIS report, AT&T Illinois argues that "so long as federal law *authorized* AT&T Illinois to obtain relief on March 11, 2005, and to use the December 2003 data as the basis for such relief," the ICC was not free to disallow it. (R. 43, Reply at 11 (emphasis added).) By contrast, the ICC and Defendants/Intervenors argue that "it is the ICC, not AT&T Illinois, that is vested with the authority to determine if wire centers have been validly designated as non-impaired in accordance with the FCC rules." (R. 40, Defs.'/Intervenors' Resp. Br. at 14-15; R. 37, ICC Resp. at 10, 12.)

The ICC and AT&T Illinois each direct the Court to one case in support of their arguments, while Defendants/Intervenors cite no case law in support of their argument on this issue. The ICC directs the Court to the unpublished Eastern District of Michigan case cite above. In that case, the court assumed, without citation to any case law, that the state commission was "free to determine" which ARMIS data would provide a more accurate picture of competition *Michigan Bell Tel. Co.*, 2007 WL 1343691, at *4.

For its part, AT&T Illinois argues that *Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 179 F.3d 566, 573 (7th Cir. 1999), supports its argument, paraphrasing that case as holding "'[t]hat

the [1996] Act does not *require*' incumbents to use the December 2003 data 'is not to say that it *prohibits*' the use of such data." (R. 43, Reply at 11 (emphasis in AT&T Illinois' brief).) Paraphrasing, however, is a dangerous business. After reading AT&T Illinois' briefs, this Court was surprised to find that in *WorldCom Techs.*, the Seventh Circuit upheld the *ICC's*—not the ILEC's—interpretation of the FCC rules. In that case, the Seventh Circuit held that the ICC order did not violate federal law—as set out in the 1996 Act or in the FCC's interpretation of the Act—because, while the the 1996 Act did not require the ICC's findings, neither did it *prohibit* them. *WorldCom Techs., Inc.*, 179 F.3d at 573 (explaining that "[t]he FCC sets out factors which the state commissions may consider in evaluating the parties' intentions, concluding that the factors are illustrative only and that state commissions, not the FCC, are the arbiters of what factors are relevant in the determination."). Similarly, and more recently, in *MPower Commc'ns*, the Seventh Circuit directed that the ICC's findings be upheld where the FCC "ha[d] not taken a stand" on the issue, but rather established only that "X [wa]s a lawful way to proceed," not that "X [wa]s the *only* way to proceed." *Id.* at 631-32 (emphasis in original).

Likewise, here, the *TRRO* did not require the use of data from an already-filed ARMIS report to determine impairment; rather, the *TRRO* simply required the use of objective business line data from an ARMIS report to determine whether a particular wire center was impaired. The ICC properly interpreted the *TRRO* as requiring the use of objective business line data that AT&T Illinois already created for other regulatory purposes, specifically the ARMIS reports. What followed—and what AT&T Illinois disputes—was the ICC's application of the *TRRO* rules to the specific AT&T Illinois impairment designations at issue here. As to this issue of fact, all the Court needs to do "is determine whether the ICC's bottom line is supported by the record."

11

*MPower Comme'ns*, 457 F.3d at 629. The ICC's determination that AT&T Illinois should use more current, objective ARMIS business line data, so that it would provide a more accurate snapshot of conditions as they existed at the time of AT&T Illinois's wire center designations, is reasonable and supported by the record. ICC Order at 5. Accordingly, the Court sustains the ICC's decision on this issue.

## II.     Count II: Fiber-Based Collocators

In addition to the number of business lines, as explained above, the FCC ruled that the number of fiber-based collocators, or FBCs, is also critical to the determination of whether a wire center is impaired. *TRRO* ¶ 5. In making its impairment designations, AT&T Illinois calculated that where two carriers are "cross-connected" through one fiber-based collocator, both carriers should count as FBCs. This calculation did not affect the two impairment designations reversed by the ICC (those designations would have been reversed anyway based on the ICC's business lines determination above). Nevertheless, the ICC held that AT&T Illinois' FBC calculations were erroneous, and ruled that: (1) where a carrier with facilities collocated in an AT&T Illinois wire center is cross-connected to another carrier's fiber transmission facility that exits the wire center, the first (cross-connected) carrier cannot be counted as a fiber-based collocator under the FCC's rules, 47 C.F.R. § 51.5; and (2) DS3 capacity coaxial cable used by a CLEC to cross-connect to another carrier's fiber-based transport facilities is not a "comparable transmission facility" to fiber-based facilities under 47 C.F.R. § 51.5, and therefore a CLEC cross-connected to another carrier by such a coaxial cable is not a "fiber-based collocator." In Count II of their complaint, AT&T Illinois disputes these ICC determinations and seeks declaratory and injunctive relief as to these rulings.

12

## A. Subject Matter Jurisdiction

Before considering the merits of the parties' claims, the Court must address the Defendants/Intervenors threshold argument that this Court lacks subject matter jurisdiction over the ICC's FBC rulings because they do not present an actual controversy. (R. 40, Defs.'/Intervenors' Resp. Br. at 21.) In its initial list of wire centers designated as non-impaired, AT&T Illinois counted only one cross-connected carrier as an FBC, and there were sufficient other FBCs at that wire center to qualify for non-impaired status even without counting the cross-connected carrier as an FBC. (R. 40, Defs.'/Intervenors' Resp. Br. at 21-22.) Because the ICC's FBC rulings did not affect the two impairment designations reversed by the ICC, Defendants/Intervenors argue that whether the ICC's rulings will affect AT&T Illinois' ability to designate additional wire centers as non-impaired in the future is "purely conjectural," and thus have not resulted in any injury to AT&T Illinois. (*Id.* at 22-23.) AT&T Illinois, however, contends that because the ICC stated that its Order will apply to all future designations, the ICC's FBC determinations are fit for review because the rule will apply to all of AT&T Illinois' future attempts to designate wire centers as non-impaired. (R. 43, Reply at 35.)

Both the Declaratory Judgment Act and Article III dictate that federal courts may only adjudicate "actual cases and controversies." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707 (7th Cir. 2002) (internal citations and quotations omitted). "A case or controversy requires a claim that is ripe and a plaintiff who has standing." *Indiana Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007). Defendants/Intervenors blend the two issues together, but they are two distinct inquiries: "Whereas ripeness is concerned with when an action may be brought, standing focuses on who may bring a ripe action." *Id.* (internal citations and quotations omitted).

The Court first determines whether AT&T Illinois has standing to bring this action. AT&T Illinois, the party invoking federal jurisdiction, has the burden of establishing the requisite standing. *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 949 (7th Cir. 2005). "To have standing, a plaintiff must have a cognizable injury that is causally connected to the alleged conduct and is capable of being redressed." *Shepard*, 507 F.3d at 549 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). Specifically, AT&T Illinois "must demonstrate (1) an injury in fact, which is (a) concrete and particularized and (b) actual or imminent; (2) that is traceable to the [ICC's decision]; and (3) that is likely to be redressed by a favorable decision from this Court." *Bensman*, 408 F.3d at 949. The injury-in-fact requirement can be satisfied by "a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007).

Here, the ICC made a determination that under the FCC rules, AT&T Illinois had to change its method of counting FBCs when making its wire center impairment designations. The question is whether an injury-in-fact has occurred where the ICC's ruling on the FBC issue has not yet affected AT&T Illinois' impairment designations and unbundling requirements. The United States Court of Appeals for the D.C. Circuit addressed the standing issue on a challenge to an FCC order requiring ILECs to price certain intrastate service lines at forward-looking, cost-based rates. *See New England Public Commc'ns Council, Inc. v. F.C.C.*, 334 F.3d 69 (D.C. Cir. 2003). In that case, the FCC contended that because it had only established a standard for state commissions to apply in evaluating the ILEC's tariffs and had "made no determination as to the actual payphone line rate to be charged," the ILECs had not suffered "actual or imminent"

14

injury that was traceable to the FCC order or redressable by the district court. *Id.* at 73 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The FCC argued that there could be no injury in fact until the states applied the rate-setting methodology and the petitioners were forced to either charge less or pay more. *Id.* at 74. The Court of Appeals disagreed, holding that the petitioners' injury was "both clear and immediate," because the ILECs would have to lower or maintain their existing rates before submitting them for state review. *Id.* Likewise, although the issue of standing was not specifically discussed, in *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467 (2002), the Supreme Court reviewed a challenge to the FCC's prescription of a forward-looking cost-based rate-setting methodology to be applied, in the future, by state commissions.

Similarly, the Tenth Circuit recently determined that a CLEC and ILEC had shown injury-in-fact in a challenge they brought against the Colorado state public utilities commission for requiring them to submit their agreement on switching and shared transport services to the commission for approval. *See Qwest Corp. v. Pub. Utils. Comm'n of Colorado*, 479 F.3d 1184 (10th Cir. 2007). Although no determination had been made as to the agreements, the Court of Appeals held that the petitioners adequately alleged injury-in-fact because the obligation to file the agreement "*could* force Qwest [the ILEC] to provide switching and shared transport services . . . to other CLECs on the same terms that it reached with MCImetro." *Id.* at 1191 (emphasis added). The Court held that the petitioners had standing because this claimed injury could be redressed if the Court vacated the state commissions' orders, so that no CLEC could force Qwest to accept the same terms it agreed upon with MCImetro. *Id.* at 1192.

AT&T Illinois alleges a similar injury in fact here: because of the ICC Order, AT&T

Illinois will be forced to avoid counting FBCs in the manner prohibited by the order. This injury is concrete and particularized, as well as imminent, even though it did not affect the wire center counts in AT&T Illinois' initial designations, because the ICC Order applies to the future wire center impairment designations that AT&T Illinois must make. The ICC Order is the cause of this injury, and AT&T Illinois' alleged injury would be redressed if this Court reverses the ICC's ruling on the FBC issue. Therefore, AT&T Illinois has standing to bring this action.

Next, the Court must consider ripeness. Two factors determine whether an issue is ripe for judicial consideration: (1) the issue on which review is sought must be fit for judicial decision; and (2) courts must take into account any hardship to the parties of withholding court consideration. *Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) (citing *Texas v. United States*, 523 U.S. 296, 300-01 (1998)). "Ripeness is, essentially, a question of timing." *Sprint Spectrum L.P. v. City of Carmel, Indiana*, 361 F.3d 998, 1002 (7th Cir. 2004). "The ripeness doctrine exists to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 477 (7th Cir. 2007) (internal citations and quotations omitted).

For an issue to be fit for judicial review, "one does not have to await the consummation of threatened injury to obtain preventative relief," especially where waiting for the actual injury to occur "will not clarify the presentation of issues." *Sierra Club v. Marita*, 46 F.3d 606, 612-13 (7th Cir. 1995). AT&T Illinois argues that the dispute is ripe for judicial review because although enforcement of the FBC rule has not yet occurred, application of the rule in the future is

16

inevitable. (R. 43, Reply at 35-36.) The ICC argues that its opinion on FBCs is not ripe because with "ever-changing" technology, it is not possible now to "determin[e] exactly what transmission media are comparable to fiber-optic cable." ICC Order at 9. Indeed, as new technology is created and employed to transmit communications, the FCC may need to issue additional unbundling rules, which the ICC will then have to aid the local exchange carriers in applying. However, there is evidence of a "real threat of enforcement" of the rules established by the ICC Order, *Shepard*, 507 F.3d at 550, before the hypothetical, and unpredictable, technology changes occur. In *Sierra Club*, the Seventh Circuit held that the plaintiffs "need not wait to challenge a specific project when their grievance is with an overall plan." *Sierra Club*, 46 F.3d at 614. The Court reasoned that the plan would *direct* the plaintiffs' activities from then on, and thus the matter was ripe. *Id.* Similarly, the ICC Order will direct AT&T Illinois' activities from now on, as they must follow the ICC's ruling in their impairment designations. *See also MCI Telecomms. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 548 n.2 (6th Cir. 2004) (holding that SBC's claim for prospective relief was "currently fit for judicial review and w[ould] clarify not only future decisions affecting the interconnection agreement, but also the past and current agreements."). Moreover, the challenge here "raises almost purely legal issues that are quintessentially fit for present judicial resolution." *Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 882 (7th Cir. 2003) (internal quotations and citations omitted).

In addition, the hardship to AT&T Illinois weighs in favor of adjudication of its claims. AT&T Illinois may show hardship by demonstrating either that: (1) "enforcement is certain, only delayed;" or (2) "even though enforcement is not certain, the mere threat of future enforcement has a present concrete effect" on AT&T Illinois' day-to-day affairs, and "irremediably adverse

17

consequences would flow from a later challenge." *Milwaukee County*, 325 F.3d at 882 (internal citations and quotations omitted). Here, as AT&T must make impairment designations in the future constrained by the ICC Order, the mere threat of future enforcement thus has a present concrete effect on AT&T Illinois. The Seventh Circuit held that in a case such as this, "[w]hen a party is faced with the choice between the disadvantages of complying with an ordinance or risking the harms that come with noncompliance, [they] are satisfied that an actual 'case or controversy' exists that allows a court to act." *Id.* Now, "saddled with" the designation requirements imposed by the ICC Order, AT&T Illinois is placed in a worse position than it was before the order, "even if, after a legal battle, [AT&T Illinois] successfully argue[s]" that the ICC Order violates federal law. *Id.* Accordingly, this matter is ripe for review, and the Court now turns to the merits of Count II.[5]

---

[5] Defendants/Intervenors argue one additional procedural ground for dismissal of AT&T Illinois' Complaint that deserves only summary attention. They contend that AT&T Illinois is collaterally estopped from contesting this portion of the ICC Order because in December 2006, while seeking FCC approval to acquire BellSouth, AT&T (AT&T Illinois' parent company) promised the FCC that when designating wire centers, it would exclude from its count of FBCs "entities that do not operate (*i.e.*, own or manage the optronics on the fiber) their own fiber into and out of their own collocation arrangement but merely cross-connect to fiber-based collocation arrangements." (R. 40, Defs.'/Intervenors' Resp. Br. at 33-34.) Collateral estoppel occurs where "(1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must be fully represented in the prior action." *H-D Michigan, Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007). The issue here, however, was not actually litigated *In the Matter of AT&T Inc. and BellSouth Corp.*, 22 F.C.C.R. 5662, 5809 (Mar. 26, 2007). That order involved a unique set of circumstances. In Appendix F to the FCC's order, the FCC lists certain conditions of the merger, including requiring AT&T/BellSouth to determine which wire centers no longer meet non-impairment thresholds excluding certain fiber-based arrangements, including entities that "do not operate" fiber. These conditions listed in Appendix F to the FCC's order do not constitute matters actually litigated, and thus AT&T Illinois is not estopped from raising the issues in Count II of its Complaint.

18

### B. Merits

In its initial wire center designations, AT&T Illinois counted its fiber-based collocators as including: (1) CLECS that "had collocated in a wire center and installed their own fiber transmission facility;" and (2) "in a small number of cases, CLECs that collocate in a wire center and then cross-connect (usually via a copper coaxial cable) to another CLEC's collocation equipment and lease capacity on that CLEC's fiber transmission facility." (R. 33, AT&T Opening Br. at 11.) As explained above, the ICC ruled that AT&T Illinois' method for counting and defining FBCs to include CLECs that use (or "cross-connect to") the fiber facilities operated by another fiber-based collocator was improper. Specifically, the ICC held that a collocated CLEC that connects to another collocated CLEC in a wire center using a DS3 or higher capacity connection and uses that other CLEC's fiber transport facility does not qualify as a fiber based collocator under the FCC's rules because: (1) the cross connected CLEC has not "install[ed] all the facilities and duplicate[d] the ILEC's network;" and (2) the coaxial cable cross-connect linking the two CLECs "is not comparable to fiber-optic based facilities." ICC Order at 16-18. AT&T Illinois argues that this ruling violates federal law because "nothing in the FCC's Rules prevents cross-connected carriers from counting as fiber-based collocators." (R. 33, AT&T Opening Br. at 20.)

"Collocation" occurs when a competing carrier installs its own equipment inside an incumbent carrier's wire center. (R. 33, AT&T Illinois Opening Br. at 7.) The FCC defines "fiber-based collocator" as:

> A fiber-based collocator is any carrier, unaffiliated with the incumbent LEC, that maintains a collocation arrangement in an incumbent LEC wire center, with active electrical power supply,

19

and operates a fiber-optic cable or comparable transmission facility that: (1) Terminates at a collocation arrangement within the wire center; (2) Leaves the incumbent LEC wire center premises; and (3) Is owned by a party other than the incumbent LEC or any affiliate of the incumbent LEC, except as set forth in this paragraph. Dark fiber obtained from an incumbent LEC on an indefeasible right of use basis shall be treated as non-incumbent LEC fiber-optic cable. Two or more affiliated fiber-based collocators in a single wire center shall collectively be counted as a single fiber-based collocator.

47 C.F.R. § 51.5. In the *TRRO*, the FCC further states that "less traditional collocation arrangements such as Verizon's CATT fiber termination arrangements" may also count as FBCs. *TRRO* ¶ 102. The parties here dispute whether a cross-connected collocator "operates a fiber-optic cable or comparable transmission facility" or whether the cross-connected collocators are "less traditional collocations arrangements" comparable to Verizon's CATT fiber termination arrangements.[6]

The ICC held that the second CLEC in a collocation-to-collocation arrangement can never count as an FBC because that would "double count the one CLEC that has made the investment to install all the facilities and duplicate the ILEC's network." ICC Order at 16. The first CLEC that installed the fiber transport facilities duplicated the ILEC's network, but the

---

[6] The Court notes that AT&T Illinois argues that this Court may not consider what it means to "operate" fiber because the ICC Order did not explicitly discuss this. AT&T Illinois cites to *Moab v. Gonzales*, 500 F.3d 656, 659-60 (7th Cir. 2007), for the principle that an administrative agency's order can only be upheld on the same basis articulated in the order by the agency itself. At issue, however, is a matter of law as to whether the ICC's definition of FBCs is valid under federal law. Thus, this Court's review is *de novo*, and this Court is obligated to review the FCC rules and regulations as well as the 1996 Act, to determine whether the ICC Order violates federal law. Where, as here, the ICC reviewed, in great detail, the reasons that a cross-connected carrier should not be considered an FBC under federal law, and the Code of Federal Regulations specifically requires that an FBC "operate" a fiber optic cable or comparable transmission facility, the Court properly considers—indeed must consider—what it means to "operate" fiber under the law.

second CLEC did not. *Id.* In the *TRRO*, the FCC stated that: "We use fiber-based collocation as a key factor in determining where competing carriers already have deployed fiber transport facilities because a sufficient degree of such collocation indicates the duplicability of these network elements and, thus, a lack of impairment." *TRRO* ¶ 96. The ICC determined that the second CLEC in a collocation-to-collocation arrangement was not an FBC under FCC definition because it would overstate the extent of competitive alternatives and ease of deployment of a CLEC's own network at the wire center. ICC Order at 16. In addition, the ICC found that the Verizon CATT arrangement was distinguishable because, unlike the cross-connected collocators, it does not double-count a second carrier's FBC facilities and thus does not count as "less traditional collocations arrangements." ICC Order at 16-17.

AT&T Illinois, however, argues that counting cross-connected collocators is permissible under FCC rules because the cross-connected carriers' investments in connecting to and leasing the fiber transport demonstrates the lack of impairment in that wire center through their willingness and ability to spend money to use fiber transport. (R. 43, AT&T Illinois Reply at 20 (citing *TRRO* ¶ 102).) Although cross-connected collocators do not "provide" optronics equipment that lights the fiber to operate it, they design it, decide on type and quantity, negotiate rates and terms, decide on traffic, control transmission and aggregating equipment, make engineering and market entry determinations, and monitor use of the facilities. (R. 43, AT&T Illinois Reply at 23-24.) The *TRRO*, however, does not look to these factors as indicators or impairment, rather, the *TRRO* looks to the ability of CLECs to "deploy transport facilities" as a sign that a wire center was not impaired. *TRRO* ¶ 102. Further, federal regulations look to whether the carrier "operates a fiber-optic cable," 47 C.F.R. § 51.5, and nowhere do they indicate

that factors short of deployment may constitute operation. *See Michigan Bell Tel. Co., Inc. v. Lark*, No. 06-12374, 2007 WL 1343691, at *7 (E.D. Mich. May 8, 2007) (holding that when a fiber-based collocator is cross-connected with another collocator, the second cross-connected collocator should not be counted as a fiber-based collocator for purposes of determining wire center designations, because the second FBC does not "operate" a fiber-optic cable).

Following the FCC's guidance, the ICC disagreed with AT&T Illinois and found that a cross-connected collocator does not signify a CLEC's ability to deploy or operate its own transport facilities. ICC Order at 16. In determining whether a particular telecommunications arrangement demonstrated a CLEC's ability to deploy its own facilities, the ICC was making a determination of fact, to which this Court owes deference. The ICC was not interpreting federal law, but rather was using its unique technical expertise to determine whether the arrangement at a particular wire center indicated impairment.[7] *See TRRO* ¶ 165 (mandating that impairment should be decided on a wire center-by-wire center basis because the feasibility of constructing loops to serve customers at the DS1 and DS3 capacities is more case-specific, prohibiting a national finding). For the reasons set out above, the ICC's "bottom line is supported by the record." *MPower Commc'ns*, 457 F.3d at 629.

AT&T Illinois also argues that cross-connected collocators are similar to the "CATT fiber termination arrangements" utilized by Verizon, which the FCC mentioned in the *TRRO* might

---

[7] The *TRRO* provides no explicit guidance on "cross-connected" collocators. In fact, it does not mention cross-connected collocators. Nevertheless, in defining "fiber-based collocators," the federal regulations state that: "Two or more affiliated fiber-based collocators in a single wire center shall collectively be counted as a single fiber-based collocator." 47 C.F.R. § 51.5. Although no party raises this point, it further persuades this Court that the FCC did not intend to "double-count" FBCs.

constitute "less traditional collocation arrangements" that could be considered fiber-based

collocation for impairment designation purposes. *TRRO* ¶ 102. The ICC disagreed, finding that

Verizon's CATT fiber termination arrangement is distinguishable from cross-connected

collocators. ICC Order at 17. AT&T Illinois does not dispute the ICC's and

Defendants/Intervenors' explanation that under the Verizon CATT arrangement, CLECs that

cross-connect to the purchaser of the CATT service would still be required to light, or activate,

fiber optic using their own optronics equipment. (R. 37, ICC Resp. at 17; R. 40,

Defs.'/Intervenors' Resp. Br. at 36-38.) By contrast, the cross-connected collocators that AT&T

Illinois sought to count in making its impairment designations must purchase already lit, or

activated, fiber capacity from the FBC. (R. 37, ICC Resp. at 17.) AT&T Illinois, however, notes

that in both arrangements, one wholesale transport provider installs the fiber transport from the

wire center and then offers to lease capacity on that facility to any collocated carriers in that wire

center. (R. 43, AT&T Illinois Reply at 20.) That similarity, however, does not negate the ICC's

determination that the arrangements here differ sufficiently such that they should not be

considered "less traditional collocations arrangements" under FCC rules. The FCC did not

provide additional guidance on the "less traditional collocation arrangements." The ICC's

finding that the cross-connected arrangements here differ from the CATT arrangements

mentioned in the *TRRO* is reasonable and supported by the record, and the Court defers to the

ICC's determination that the cross-connected arrangements here are distinguishable from the

Verizon CATT arrangements.[8]

The ICC further held that cross-connected collocators do not operate a "comparable transmission facility" for the purpose of defining FBCs. ICC Order at 18 (citing 47 C.F.R. § 51.5). Coaxial cables are used to cross-connect to another CLEC's collocation equipment. ICC Order at 18. The ICC reasoned that while fiber is capable of speeds of up to 192 DS3 circuits, coaxial cable is limited to a transmission capacity of one DS3, and even then cannot transmit signals reaching the same distances that fiber-optic cable can reach. ICC Order at 18.[9] AT&T Illinois argues, however, that cross-connected collocators are akin to fixed wireless collocation arrangements, which have only one DS3's worth of capacity, yet which the FCC found do count as FBCs as they "nevertheless signal the ability to deploy transport facilities." (R. 43, Reply at 27 (citing *TRRO* ¶ 102).) The ICC disputes the analogy to fixed wireless arrangements because those are physical transmission mediums which actually leave a wire center, and thus are comparable transmission facilities to FBCs, whereas a coaxial cable runs between a carrier that leases transport service from an FBC to the collocation cage of that carrier and does not leave the wire center. (R. 37, ICC Resp. at 20-21.) With a coaxial cable, capacity leaves the wire center using the fiber-optic cable of a legitimate FBC, not through the cross-connected CLEC's own physical transmission medium. (*Id.*) Thus, the ICC, in a reasonable exercise of its discretion in

---

[8] Further, the Court notes that in a footnote to the *TRRO*, the FCC states that its goal of increasing competition and encouraging facilities deployment is promoted when a CLEC invests in its own optronics to "light" dark fiber. *TRRO* at 157 n.496. This demonstrates that in determining impairment, the FCC values an individual CLEC's deployment and "lighting" of its own fiber, rather than merely the purchasing of an already lit facility.

[9] *But see XO Commc'ns Servs., Inc. v. Ohio Bell Tel. Co.*, No. 2:07 C 500, 2008 WL 755863, at *4 (S.D. Ohio Mar. 18, 2008) (upholding as reasonable Ohio state commission's determination that the fixed wireless arrangement was comparable to coaxial cable).

the absence of specific FCC guidance on the cross-connected collocators at issue here, held that when a CLEC cross-connects via coaxial cable, it does not operate a "comparable transmission facility" for purposes of the FCC's FBC definition. Therefore, the Court finds that the ICC's determination that cross-connected CLECs should not be counted as FBCs was reasonable and supported by the record.

## CONCLUSION

Accordingly, the Court affirms the ICC's decision on both issues for which AT&T Illinois sought review in this case. For the reasons stated above, the relief sought by AT&T Illinois in its Complaint (R. 1) is denied, and AT&T Illinois' Complaint is dismissed. The Clerk of the Court is directed to enter judgment in favor of the ICC and Defendants/Intervenors.

Date: August 11, 2008          ENTERED:

Ruben Castillo
United States District Judge

25